UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| James A. Anderson, | Case No. 06-CV-5028 [PGS/JJG] |
| Plaintiff, | |
| vs. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SUMMARY JUDGMENT** |
| John S. Spreiter, Mary E. Spreiter, Home State Bank, a Minnesota corporation, CJB, LLC, a Minnesota limited liability company, Banken Real Estate Investments, LLC, a Minnesota limited liability company, and Chad Banken, | |
| Defendants. | |

---

INTRODUCTION

This memorandum is submitted by Plaintiff James A. Anderson in opposition to the motions for summary judgment made by Defendants John S. Spreiter, Mary E. Spreiter and Home State Bank, and Defendants CJB, LLC, Banken Real Estate Investments, LLC and Chad Banken.

FACTS

This lawsuit involves a parcel of agricultural property located in Meeker County, Minnesota, comprised of approximately fifty-three (53) acres (the "Property"). The Property has been in the Plaintiff's family for generations. Plaintiff purchased the Property from his father and mother in January, 1999, and at all times relevant to this matter has resided at the Property as his homestead. Plaintiff currently resides at the Property with his two sons, ages 11 and 13.

The Property was subject to a mortgage in favor of First Minnesota Bank, NA in the amount of $124,000.

Late in 2002 Plaintiff's spouse began having health problems and the mortgage in favor of First Minnesota Bank, NA fell into arrears. Foreclosure proceedings were commenced in

April of 2003, and the Property was sold at a sheriff's sale for $132,243.08 on June 19, 2003. (The law allowed Plaintiff twelve (12) months, until June 19, 2004, to redeem the Property from the sheriff's sale.)

Following the foreclosure, Plaintiff spoke with multiple banks about refinancing the Property in order to redeem from the sheriff's sale. In furtherance of these efforts, Plaintiff contacted Faith Rocha, a mortgage broker, for assistance in refinancing the Property. Through Ms. Rocha, Plaintiff was introduced to Chad Banken ("Banken"). Banken's role was to help Plaintiff avoid the loss of the Property.

Ms. Rocha's job was that of a mortgage broker. She did not serve as a real estate agent; the Property was never listed for sale. Plaintiff had always intended to keep the Property in his family. It has been in his family for generations and he has expectations of it remaining in his family for generations.

The sole purpose of the transaction between Plaintiff and Chad Banken and his companies was to acquire the funds necessary to redeem from the mortgage foreclosure. It was understood by Plaintiff and by Banken that Plaintiff would remain in possession of the Property so long as he made the necessary payments to Banken.

Upon information and belief, the market value of the Property in 2004 was approximately $315,000. The Estimated Market Value for tax purposes in 2004 was $296,400, and in 2007 was $360,500.

Plaintiff and Banken and his companies, CJB, LLC ("CJB") and Banken Real Estate Investments, LLC ("BREI") entered into a transaction to help Plaintiff save his Property from foreclosure. Although the essence of the transaction between Plaintiff and CJB was a loan to Plaintiff to redeem from the foreclosure with repayment secured by the Property, the transaction

was structured as an outright transfer of the Property from Plaintiff to Banken and CJB and a companion agreement to allow Plaintiff to occupy the Property with an option for Plaintiff to repurchase the Property. The "sale" of the Property and option to repurchase the Property were executed on the same day.

On June 18, 2004, Banken and CJB loaned to Plaintiff $143,341.14. Plaintiff provided CJB a Warranty Deed to the Property. (Plaintiff claims this Warranty Deed is actually an equitable mortgage.)

On the same day the proceeds from this loan to Plaintiff were used by Plaintiff to redeem the Property from the sheriff's sale.[1] Plaintiff received no cash or other payment for "selling" the Property to CJB; CJB "purchased" the Property (free of all debts) for no value paid to Plaintiff.

Upon obtaining the Warranty Deed to the Property, CJB granted a mortgage on the Property to Home State Bank in the amount of $195,000.

The transfer of the Property to CJB was conditioned upon and contemporaneously coupled with CJB giving Plaintiff the right to occupy and the option to repurchase the Property, as provided in a document of the same date, entitled "First Right of Refusal to Purchase dated June 18, 2004" ("First Right of Refusal"). The First Right of Refusal required Plaintiff to pay $2,000 in closing costs, $5,000 on June 25, 2004, and property taxes and insurance. The First Right of Refusal also required Plaintiff to pay $215,000 by September 17, 2005.

Essentially Banken and CJB leant $143,341.14 to Plaintiff and Banken and CJB charged Plaintiff $76,658.86 as interest on the loan.

---

[1] Plaintiff, not Defendants, redeemed from the sheriff. See the Sheriff's Certificate of Redemption, Exhibit B to the Affidavit of James A. Anderson.

After redeeming from the sheriff, Plaintiff continued to reside at the Property, pay property taxes and pay insurance on the Property.

Plaintiff was unable to obtain financing to exercise his option to purchase the Property by September 17, 2005. Plaintiff had been dealing with John Spreiter, senior vice president at Home State Bank concerning the needed refinancing. From conversations with Mr. Spreiter, Plaintiff understood financing would be available. However, weeks prior to the September 17, 2005 deadline, Mr. Spreiter advised Plaintiff that Home State Bank was unwilling to extend the financing needed. However, Mr. Spreiter advised that he would be willing to personally become involved in the financing. (Apparently Mr. Spreiter observed how lucrative this sort of financing can be and decided he would like to share in some of this.)

As a part of the refinancing with Mr. Spreiter, Plaintiff and his father provided Quit Claim Deeds to CJB on September 15, 2005[2]. No consideration was paid to Plaintiff or Plaintiff's father for the Quit Claim Deeds.

At the time the Quit Claim Deeds were given, Plaintiff and his father and CJB and Spreiter mistakenly understood that fee title to the Property had transferred to CJB by the Warranty Deed given on June 18, 2004, the deed we seek to be construed as an equitable mortgage. The parties, at the time they agreed to quit claim their interest in the Property to CJB, were mutually mistaken about the rights each party had in the Property. The agreement to accept a Quit Claim Deed from Plaintiff for no consideration was an unconscionable agreement.

On September 16, 2005, CJB transferred its interest in the Property to John S. Spreiter and Mary E. Spreiter ("Spreiter") by a Warranty Deed to the Property. Spreiter provided a mortgage on the Property to Home State Bank. Plaintiff claims that the transfer of CJB's interest

---

[2] We understand that Plaintiff's father was involved because of an apparent title defect sought to be cured.

4

in the Property to Spreiter was a transfer of CJB's mortgagee's interest acquired through the equitable mortgage.

On September 16, 2005, Spreiter purportedly sold the Property to Plaintiff by entering into a Contract for Deed with Plaintiff. The Contract for Deed required Plaintiff to pay to Spreiter $230,000 plus 11% interest by September 16, 2006. The Contract for Deed is ineffective insofar as Plaintiff already owned the Property subject to Spreiter's mortgagee's interest.

Plaintiff made all of the payments pursuant to the Contract for Deed until June and July, 2006. Although Plaintiff tendered late payment of the June and July installments, Spreiter refused the tender.

On or about August 13, 2006, Spreiter served a Notice of Cancellation of Contract for Deed due to Plaintiff's failure to pay the June 2006 and July 2006 installment payments.

ISSUE

*Was the transaction between Plaintiff and Defendants an equitable mortgage?*

DISCUSSION

**The transaction between Plaintiff and Defendants is an equitable mortgage, rather than an outright sale of the Property.**

In order to properly understand the law underlying equitable mortgages, it is appropriate to review some well established concepts of mortgage law, including "equity of redemption" and "clogging the equity of redemption."

**Equity of Redemption**. Equity of redemption is simply the right of a mortgagor to redeem from a default. Without an equity of redemption a defaulting mortgagor would be subject to an absolute forfeiture.

Before the advent of the equity of redemption English common law mortgages were a fee simple conveyance to the mortgagee with a subsequent right to reenter on the part of the borrower if the loan were paid on the due date. Consequences of default were harsh; the borrower lost all right to the property, even if this was a result of being unable to find the mortgagee on the date due. *Restatement Third, Property (Mortgages)*, §3.1 (1997).

The pendulum swung the other way when a nearly indefinite right of redemption created clouds on titles.  As a result the courts of equity created the remedy of "foreclosure," which set a date certain that the mortgagor's rights ended. *Id*.  Though the courts had struck a balance between the mortgagors and mortgagees, the struggle between the interests of mortgagors and mortgagees that has characterized the nature of the equity of redemption began.

Once the remedy of foreclosure was fashioned, mortgagees were continually attempting to eliminate the mortgagor's equity of redemption.  This attempted elimination of the equity of redemption came to be known as "clogging" the equity of redemption.

> While the foreclosure remedy was designed to aid mortgagees, they nevertheless found the prospect of extinguishing the equity of redemption exclusively through that method a less than satisfactory solution. Consequently, they attempted to craft mortgage language or extrinsic contemporaneous agreements by which mortgagors purported in a variety of ways to waive or limit their equity of redemption rights. An unsympathetic Chancery responded by creating the prohibition on clogging the mortgagor's equity of redemption. Under this rule, no agreement contained in the mortgage, or contemporaneous with it, could cut off a delinquent mortgagor's equity of redemption without resort to foreclosure by the mortgagee.

\* \* \*

> The foregoing concepts as developed in English Chancery were adopted in this country relatively intact. *Restatement Third, Property (Mortgages)*, §3.1 (1997).

Minnesota law holds that a mortgagor is entitled to an equity of redemption, despite any attempts to "cloth" the transaction as something other than a mortgage.

"When land is pledged for the payment of a debt the transaction, in whatever form clothed, is a mortgage. The right of redemption cannot be waived or forfeited by an agreement made when the mortgage is created." *Sanderson v. Engel*, 182 Minn. 256, 257, 234 N.W. 450, 451 (1931).

The courts are so guarded in the protection of the equity of redemption that in the event of a later conveyance of the equity of redemption a court will closely scrutinize to confirm that there is <u>new</u> and <u>adequate</u>[3] consideration provided. *Niggeler v. Maurin*, 31 Minn. 118, 124-125, 24 N.W. 369, 373 (Minn. 1885).

> Though a mortgagee may purchase the equity of redemption, yet where the relation of the mortgagor and mortgagee is once established, the courts scrutinize with great jealousy the acquisition of the equity of redemption by the mortgagee in any other way than by regular foreclosure. [citation omitted]. And additional conveyances exacted or secured by the mortgagee for his benefit cannot be used to prevent a redemption. They "proceed from the same old root, and are subject to the same equity; otherwise hardship and oppression might be practiced upon the mortgagor. [citation omitted.] The rule is inflexible, "once a mortgage, always a mortgage.' *Marshall v. Thompson*, 39 Minn. 137, 140-141, 39 N.W. 309, 311 (1888).

There are good reasons why a mortgage lender may wish to acquire the mortgagor's equity of redemption. Such a right running in favor of the mortgagor is expensive and time consuming for the mortgagee. Nevertheless, this right of redemption is a right that cannot be bargained away. In the case of *Marshall v. Thompson*, the court explained as follows:

> It would seem that Thompson was of the opinion, which is quite prevalent, that a deed absolute in form would be more advantageous than an ordinary mortgage merely, and that under it the right of redemption might subsequently summarily be cut off without foreclosure. And the plaintiff also seems to have had the same notion, and through ignorance of his legal rights delayed making proceedings. *Id* at 142, 312.

---

[3] "One Dollar" or a peppercorn will not be sufficient.

This quoted language demonstrates the prevalence of a desire to cut off the right of redemption and also demonstrates that the attempt is ineffective despite the mortgagor's ignorance and willingness to go along with such an attempt.

Not only is the equity of redemption jealously guarded by the court, the court will examine the transaction where that right of redemption is lost in order to confirm that the consideration received in exchange for the equity of redemption is adequate. The court has long held that:

> When the real nature of a transaction between the parties is confessedly that of a loan, advanced upon the security of real estate granted to the party making the loan, whatever the form of the instrument of conveyance taken as a security, it is always treated in equity as a mortgage, to which is annexed, as an inseparable incident, the right to the equity of redemption, which can only be extinguished by foreclosure, or voluntary surrender by the party vested with the right by some new agreement founded on an adequate consideration. *Fisk v. Stuart*, 24 Minn. 97, 105, 1877 Minn. Lexis 93 (1877).

Therefore, even if a lender and borrower wished to eliminate borrower's equity of redemption at the outset of a mortgage transaction by structuring the transaction as a sale, such an attempt would be ineffective. If the transaction is truly a loan secured by an interest in real estate, then there would be equity of redemption flowing with it.

**Sale or Loan**. The question to be answered in cases of this sort is whether the transaction is a sale or a loan. Ultimately, the character of the transaction is determined by the intention of the parties. *First National Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 503 (Minn. 1981). However, the courts often make a subtle but critical error in analysis of the parties' intention. The courts sometimes mistakenly analyze the intention as: "At the time of the transaction did the parties intend to structure the transaction as a sale?" If this is the question of intention, then the answer is "yes." Likewise, the answer in all other cases finding the existence

8

of an equitable mortgage is also "yes." The parties intended to structure the transaction as a sale; there was no mistake; there was no fraud.

If this is the intention to be analyzed, then the analysis of the existence of an equitable mortgage essentially becomes a question of mutual mistake or fraud. The argument becomes, "If the parties intended to enter into the documents that they entered into, then the documents are effective." Utilizing this analysis, the doctrine of equitable mortgage is gone; there would be no equitable mortgage doctrine standing on its own. Instead, equitable mortgages would be swallowed up by the doctrines of mutual mistake and fraud.

This is the analysis the Defendants would have the court adopt. That is the explanation for why the Defendants' Affidavits are simply a statement that they intended the transaction to be a sale.

If this court reviews those cases having found an equitable mortgage, the court will find that none of them involve an analysis of mutual mistake or fraud. Rarely do courts analyze the intention of the parties to fashion the transaction as they did. Instead, the proper analysis taken by most courts is whether the parties intended a *bona fide* sale of the property or intended to pledge the property to secure repayment of money.

The following cases are very similar to the facts and circumstances of our case and the question asked is not whether the parties intended to structure the transaction as they did but instead whether the parties intended a *bona fide* sale. *Roehrs v. Thompson*, 179 Minn. 73, 228 N.W. 340 (1929); *Jeddeloh v. Altman*, 188 Minn. 404, 247 N.W. 512 (1933); *Minnesota Building & Loan Association v. Closs*, 182 Minn. 452, 234 N.W. 872 (1931); and *Albright v. Henry*, 285 Minn. 452, 174 N.W.2d 106 (1970).

Plaintiff suggests to the court that the parties' intentions is not determined by a bold faced allegation of intention. Instead, intention is determined by the facts and circumstances surrounding the transaction.

The essence of the doctrine of equitable mortgage is to look past the surface of the transaction to its true nature. This is why almost all equitable mortgage cases disregard the effect of a "a deed absolute on its face." The form of the documentation is not important.

> As a general rule, in equity, when the real nature of the transaction between the parties is that of a loan, advanced upon the security of realty granted to the party making the loan, it may be treated as an equitable mortgage, without regard to the actual form of the instrument of conveyance. It is within the province of the trial court to determine, by looking beyond that form, the actual character of the transaction. [citations omitted] *First National Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 503 (1981).

Defendants rely upon the case of *Ministers Life and Casualty Union v. Franklin Park Towers Corp.*, 239 N.W.2d 207 (Minn. 1976). We believe that *Ministers* Life focuses upon the wrong "intent." Although this case comes to the correct conclusion (insofar as it involves a sale of property with no right to reacquire title by the seller), the court introduces a list of poorly designed "corollaries" or "some of the corollaries." (The *Ministers Life* court does not suggest the list is exhaustive.)

We believe that the corollaries listed by the *Ministers Life* court are deficient. Particularly insofar as the corollaries suggest that the form of the documentation and the absence of words like debt, security, or mortgage create evidence of the absence of an equitable mortgage. This analysis focuses upon the form of the transaction and is contrary to the established body of law concerning equitable mortgages.

Instead of evaluating the "corollaries" specified in *Ministers Life* we point the court to the factors cited in *Jones v. REES-MAX, LLC*, 2007 WL 2697059 at *4 (D. Minn. Sept. 17, 2007) (*citing Brown v. Grand Holding, LLC*, 394 F. Supp.2d 1090, 1097-99 (D. Minn. 2005). Those factors include:

1. The disparity between the value of the property and the price paid;

2. The nature of the solicitation that gave rise to the transaction;

3. Attempts to sell the property on the open market;

4. Whether there was a negotiated sale price; and

5. Whether there was continued occupancy.[4]

It is upon a review and analysis of these factors that the intention of the parties can be ascertained; the parties' intention is not determined merely by what they claim the intention to be.

Based upon the factors cited in *Jones v. REES-MAX, LLC*, it is clear that this transaction is an equitable mortgage.

    (a)    <u>Disparity in Value</u>.  The purchase price provided in the Purchase Agreement with Chad Banken was a function of the amount needed to redeem from the sheriff and not a function of the value of the Property.  The entire amount of the purchase price was paid in redemption of the Property plus fees to Banken and others; no portion of the purchase price was paid to the Plaintiff.  The purchase price was approximately $195,000.  On the other hand, Plaintiff estimates the value of the Property in 2004 to be $315,000.  The County Assessor estimates the value of the property for tax purposes to

---

[4] Similar lists of factors to consider in determining the existence of an equitable mortgage can be found at 4 *Powell on Real Property* (Michael Allan Wolf, General Editor) §37.18 at pp. 37-118 (2000) and at *Restatement Third, Property (Mortgages)*, §3.2 (1997).  The court

11

be $296,400. Both of these amounts are substantially different from $195,000, particularly when considering that none of the price was paid to Plaintiff.

      (b)    <u>Nature of the Solicitation</u>. Plaintiff was not soliciting an offer to buy the Property. Plaintiff was continually looking for financing to pay the sheriff the redemption price. Plaintiff was advised that Banken and his companies were in the business of helping people save their properties.[5] The nature of the solicitation that gave rise to the transaction was involving a mortgage broker, Faith Rocha, and not a real estate agent.

      (c)    <u>Attempt to Sell the Property</u>. Plaintiff never attempted to sell the Property on the open market. As a matter of fact, given the fact that the Property has been part of Plaintiff's family since 1887 and given the fact that Plaintiff wishes his boys to have the opportunity to grow up on the Property and wishes that benefit for his grandchildren as well, it is reasonable to conclude that Plaintiff will never list the Property for sale on the open market if he could avoid it.

      (d)    <u>Negotiated Sale Price</u>. The sale price was not negotiated. Instead, the sale price was a function of the amount needed to redeem from the sheriff's sale and pay a lien and create an escrow and pay fees to Banken or his companies.

      (e)    <u>Continued Occupancy</u>. Plaintiff has continually resided in the Property at all times relevant to these proceedings, and he continues to do so.

---

should note that none of the treatises speak to an analysis based upon fraud or mistake or include the *Ministers Life* "corollaries."

[5]    It is interesting to note that Defendant Chad Banken (represented by current counsel) was a party in the matter of *Jones v. REES-MAX, LLC* cited above. A copy of the court's Memorandum Opinion and Order is attached as Exhibit F to the Affidavit of James A. Anderson. From a review of the Opinion and Order, the court will find a description of the nature of Chad Banken's business.

## CONCLUSION

This transaction was not a sale. The price was not negotiated. There is a substantial disparity between the price paid and the real value of the Property, and the overall facts and circumstances support a claim that the parties intended to structure this transaction as a sale but intended the transaction to act as security for the payment of a debt. In the event Plaintiff had paid the debt as required, Plaintiff would never have been threatened with the loss of possession of the Property.

Given all of the facts and circumstances indicating this transaction is a equitable mortgage, it is inappropriate to enter judgment ruling otherwise.

Dated:   February 6, 2008   .

KALLAS & ASSOCIATES, LTD.

By   */s/ Michael T. Kallas*
  Michael T. Kallas, #0159499
  4940 Viking Drive, Suite 652
  Edina, MN 55435
  Telephone: (952) 832-9352
  Facsimile: (952) 832-9365

ATTORNEYS FOR PLAINTIFF

H:\LRE\A107-0601\A107-0601-0085.doc